TOOMER'S ESTATE v. UNION PAC. R. CO.

No. 7472. Decided December 18, 1951. (239 P. 2d 163.)

See 52 C. J., Railroads, sec. 2019. Railroad crossings, duty to stop, look and listen before entering. 44 Am. Jur., Railroads, secs. 546 et seq.; 41 A. L. R. 405.

*Bryan P. Leverich, M. J. Bronson, A. U. Miner, Howard F. Coray, D. A. Alsup,* all of Salt Lake City, for appellant.

*Rawlings, Wallace, Black & Roberts* and *Wayne L. Black,* all of Salt Lake City, for respondent.

CROCKETT, Justice.

John T. Toomer was struck and killed by the defendant's Streamliner train as he was crossing its railroad's track at Cokeville, Wyoming in his pick-up truck at about 4:30 p. m. on May 1, 1950. His administrator recovered a judgment for the benefit of his widow and minor child from which defendant appeals. Two principal questions are presented: (1) Was there evidence from which the jury could find that the defendant was negligent which proximately caused the collision; and (2) Was the deceased guilty of contributory negligence as a matter of law?

The jury, having found the issues in favor of the plaintiff, he is entitled to have us consider all of the evidence, and every inference and intendment fairly arising therefrom in the light most favorable to him. See *Lewis* v. *Rio Grande Western Ry. Co.,* 40 Utah 483, 123 P. 97; *Cromeenes* v. *San Pedro, L. A. & S. L. R. Co.,* 37 Utah 475, 109 P. 10, and see *Nice* v. *Illinois Cent. R. Co.,* 303 Ill. App. 292, 25 N. E. 2d 104.

Cokeville, Wyoming, is a town of approximately 500 population. The Union Pacific Railroad running in a

generally north-south direction, passes immediately to the west of the business district of the town. The chief railroad crossing is over First Street which is the main street of the town and runs westward from the town into the ranching and farming district adjacent. There are four tracks at the crossing. From the west to east they are as follows: No. 1, the west passing track; then east of it eight feet, two and one-half inches is track No. 2 the east passing track; continuing east ten feet, there and one-half inches more is No. 3, the main line track, and a considerable distance further east is No. 4, or what is called the house track. For one passing from west to east, the crossing is normally unobstructed with good visibility both north and south. It is protected by a standard cross buck sign, and by a wig-wag signal bell and flashing light located on the east side of the main line track and just south of the crossing. This signal is affected only by trains on the main line track and would be activated by a train on that track approaching from the south when it came within 1650 feet of the crossing. The signal is not connected in any way with the other tracks mentioned.

Mr. Toomer lived a short distance north and west of the crossing; on the fateful day at about 4:30 p. m. he got in his pickup truck and proceeded southward parallel to the tracks to First Street, the main road going into Cokeville, turned left and proceeded eastward toward the crossing. A northbound freight train consisting of 65 or more cars had been pulled onto track #2 (east passing track) and stopped 30 feet south of the crossing. For Toomer, approaching from the west, this train blocked out the view of the main track upon which the Streamliner approached. The freight engine was steamed up, about to move, or, according to some evidence, may have been actually starting to move at the instant of the collision. There was evidence that it gave one or more toots of its whistle and was emitting some steam. The noises incident to the normal operation of such an engine, together with the physical presence of the freight

train between Toomer and the approaching Streamliner, interfered in some degree with Toomer's ability to hear and distinguish any noises or signals of the oncoming Streamliner. We assume that the wig-wag signal was in operation and that the jury were obliged to so find. (The only testimony to the contrary was negative, inattentive observation as contrasted with abundant affirmative testimony that is was working.)

A Mr. Cozzens in a car and a Mrs. Sparks on foot traveresd the crossing immediately (within 5 seconds) prior to Toomer. Mr. Cozzens appears to have been quite attentive and caustious as he approached the crossing. He said that he observed the freight train standing south of the crossing and that he stopped and waited for some two or three minutes, after which he concluded that the freight was not going to move, and so he proceeded to cross in front of it. He further stated that he heard the whistle of the freight train but that he neither saw nor heard the Streamliner until he was in the center of the main line track at which time it loomed up about 400 feet south of the crossing, startling him, but he continued safely over. Mrs. Sparks, on foot, passed over the crossing immediately after Cozzens did; she first observed that the wigwag was ringing and operating when she was crossing over the westerly passing track. She testified that she assumed that it was being activated by the freight train and proceeded across. She was also unaware of the presence of the Streamliner until she was in the middle of the main line tracks at which time she first saw it and heard its whistle, frightening her.

Mr. Toomer had resided in Cokeville for approximately ten years and lived just a short distance west and north of this first street crossing; he was undoubtedly generally familiar with the operation of trains there. He approached the crossing just after Cozzens and Mrs. Sparks and his truck was struck about in the middle by the defendant's Streamliner train causing his death. The speed limit prescribed by ordinance of the town of Cokeville for the train

was 30 miles per hour. The plaintiff's witnesses placed its speed at from 50 to as high as 60 miles per hour.

Under the foregoing facts, the defendant makes the contentions referred to in the early part of this opinion: (1) That there was no negligence shown on the part of the railroad company, and (2) That Toomer was contributorily negligent as a matter of law.

It is unnecessary to discuss in detail the defendant's claim that there is no evidence of its negligence. The placement of the freight so close to the crossing as to interfere with both Toomer's sight and hearing of the oncoming Streamliner, taken together with the excess speed, afford ample evidence from which the jury could properly base its finding that the railroad was guilty of negligence which proximately caused the collision. Under the circumstances here existing, it cannot be said that this was an unobstructed crossing where no special hazzard existed. Therefore, the cases relied upon by the defendant to the effect that speed was not properly considered as a ground of negligence where there is no obstruction or special hazard are not in point. In *Dow* v. *Southern Pacific Co.*, 105 Cal. App. 378, 288 P. 89, at page 91, the court said,

"The running of a train at a high rate of speed over a grade crossing in the country is not ordinarily deemed negligence * * *"

but added

"The fact that the view of one approaching a railroad crossing is obstructed may make it negligence to propel a train across such a crossing at a high rate of speed."

See also *Lewis* v. *Rio Grande Western Railway Co.*, supra; *Los Angeles & S. L. R. R. Co. et al.* v. *Umbaugh*, 61 Nev. 214, 123 P. 2d 224. There is an annotation on the subject of speed of a train at a highway crossing at 154 A. L. R. 212, which states inter alia as follows:

"And at a crossing where there are two or more tracks, a train on one track may obstruct the view of a second train on another track,

and the noise made by one may tend to obscure the warning noise made by the other, in addition to drawing attention from all other matters, thus creating an additional source of danger. Such a situation may be taken into consideration in determining whether the speed of the train or locomotive causing the injury was negligent."

The important problem in this case and the one given principal attention by the parties in their briefs is the defendant's claim that the deceased was guilty of contributory negligence as a matter of law so as to bar plaintiff's recover. If all reasonable minds would ■ arrive at the same conclusion: that is, that Toomer failed to use the degree of care which an ordinary, reasonable and prudent person would have observed for his own safety under the circumstances, then the defendant's contention is correct. But if it appears from a consideration of all of the evidence that reasonable minds might conclude that Toomer had exercised ordinary and reasonable care for his own safety, then the trial court properly submitted the question to the jury.

In the case of *Newton* v. *Oregon Short Line Railroad Co.*, 43 Utah 219, 134 P. 567, 570, Mr. Justice Frick stated the rule as follows:

"All that can be said is that, unless the question of negligence is free from doubt, the court cannot pass upon it as a question of law; that is, if after considering all the evidence and inferences that may be deduced therefrom the court is in doubt whether reasonable men, in viewing and considering all the evidence, might arrive at different conclusions, then this very doubt determines the question to be one of fact for the jury and not one of law for the court. The court can pass upon the question of negligence only in clear cases. All others should be submitted to the jury."

It may be observed that where a district judge has ruled that under the evidence there is a jury question as to whether the deceased was contributorily negligent and a jury by its verdict have indicated that they believed that he was exercising ordinary, reasonable care for ■ his own safety under the circumstances, it might

seem a bit presumptuous on our part to say that "all reasonable minds" must arrive at the opposite conclusion. It is appreciated that the determination of the court and jury would not be a consideration necessarily controlling on this court. Admittedly a district judge and a jury could be mistaken and if that appeared clearly to be so, it would be the duty of this court to substitute its judgment for theirs and rectify their error. *Frank* v. *McCarthy*, 112 Utah 422, 188 P. 2d 737; *Shortino* v. *Salt Lake & Utah Railway Co.*, 52 Utah 476, 174 P. 860. However, their determination should not be wholly ignored in reviewing the situation and attempting to see it as objectively as possible, not only through our own eyes but endeavoring to project ourselves into the position of other reasonable people who may likewise be trying to see the situation objectively and without passion, prejudice or sympathy.

A good statement of the proper approach is made by the Supreme Court of Idaho in *Adkins* v. *Zalasky*, 59 Idaho 292, 81 P. 2d 1090, 1093, wherein it was stated:

"One reason for the rule that the existence of negligence, or contributory negligence, is not generally a question for the judge is that a jury is composed of members of various ages, occupations and experiences, and is in better position to determine what a reasonably prudent person would do, under stated circumstances, than is a trial judge or an appellate court * * * It is only when there can be but one possible answer, reasonably made, to that question that a trial judge, or an appellate court, should assume to decide it."

In this case we do not question the well established rule which ordinarily applies at railroad crossings, that where no special conditions of danger or hazard exist, the traveler is required to look and listen, and if necessary to stop to avoid being injured by approaching trains, and if ∎ he fails to do so, resulting in his injury, that he cannot recover because of his own contributory negligence. In the case of *Pippy* v. *Oregon Short Line Ry. Co.*, 79 Utah 439, at page 449, 11 P. 2d 305, 309, Mr. Justice Straup reiterated that rule and added,

"where a traveler, knowing that he is approaching a railroad crossing *with an unobstructed view* of the track in both directions and *there being nothing to prevent his hearing or seeing an approaching train,* advances to and upon the intersection without looking and listening, his conduct will generally impute negligence to him as a matter of law; * * *"

and continued

"* * * a presumption arises that he did not look or if he did look that he did not heed what he saw and thus is guilty of negligence, *unless under circumstances of exceptional cases where he is misled without his fault by some act of the company.*" (Emphasis added.)

citing *Clark* v. *Union Pacific R. Co.,* 70 Utah 29, at page 46, 257 P. 1050, at page 1056, in which case the court again recited the rule, pointed out that the rule applied where there was

"an unobstructed view of the track for a sufficient distance to see and discover an approaching train in time to avoid colliding with it."

It must be conceded that the look, listen and stop if necessary rule applies for even stronger reasons where there is a train-activated signal in operation. *Byerley* v. *Northern Pacific R. Co.,* 11 Wash. 2d 604, 120 P. 2d 453; *Nabrotsky* v. *Salt Lake & Utah R. Co.,* 103 Utah 274, 135 P. 2d 115. But even under those circumstances, it is subject to the limitations herein discussed concerning the general rules of conduct at railroad crossings.

We do not mean that for the rule to apply that the crossing must be out on a wide open plain with an unobstructed view in both directions, nor that slight variations from such conditions would relieve a traveler from the operation of that rule. The true test is whether or not the circumstances are such that all reasonable minds would conclude that the traveler failed to use ordinary care for his own safety. And notwithstanding the fact that we appreciate the desirability of having definite, understandable and clear-cut rules to govern human conduct

insofar as that is possible, the "all reasonable minds" rule is just about as far as one can safely go in attempting to set out a formula as to the rule of contributory negligence at railroad crossings. There is no difficulty in stating that general rule nor in finding it set forth in innumerable cases. The trouble arises when we attempt to apply it to the facts of a given case. Appropriate to the case at bar are the words of Mr. Justice Latimer in the case of *Drummond* v. *Union Pacific Railroad Co.*, 111 Utah 289, 177 P. 2d 903, 908, wherein he reiterates with approval a thought from the *Pippy case,* supra, which is often expressed in cases of this character:

" '* * * While prior decisions of this court show that we, in denying recovery in railway crossing cases on the ground of contributory negligence, have gone about as far as most cases in other jurisdictions, and farther than some, yet, in the main, we have adhered to the general rule that to a large extent each case is dependent upon and governed by its own facts, and whatever language or statements may be used or made in the cases must be considered with respect to and in view of the particular facts of the case * * *.' "

The court also so stated in *Fish* v. *Southern Pacific Co.*, 173 Or. 294, 143 P. 2d 917, 928, 145 P. 2d 991, and added

"Nice calculations made in the quietude of the office, after an accident has occurred, may be persuasive in determining whether due care has been exercised, but ordinarily negligence cannot thus be established as a matter of law. It is comparatively easy, in the light of subsequent events, to say that an accident could have been avoided if the parties involved had done this or that thing but the law does not apply such a rigid test * * *."

The court further observed

"* * * It is only in the clearest of cases that a court is warranted in withdrawing this question from the consideration of the jury."

The principle that where unusual conditions exist a jury question is presented is dealt with by the Supreme Court of the United States in the case of *Pokora* v. *Wabash Rail-*

*way Co.,* 292 U. S. 98, 54 S. Ct. 580, 581, 78 L. Ed. 1149, 91 A. L. R. 1049. The facts are, of course, not exactly the same but the situation was generally similar to the instant case. The plaintiff approached the crossing from the east. A string of box cars had been left standing on a switch track about five to ten feet from the line of the street which cut off his view to the north from where the train approached. The plaintiff made a stop ten to fifteen feet east of the switch track but heard neither bell nor whistle. He proceeded across the switch track and as he went onto the main line track a passenger train coming from the north at twenty-five to thirty miles per hour struck him. The following excerpts indicate the view the court took in holding that a jury question existed:

"* * * The record does not show in any conclusive way that the train was visible to Pokora while there was still time to stop * * * Nice calculations are submitted in an effort to make out that there was a glimpse of the main track before the switch was fully cleared * * * For all that appears he had no view of the main track northward, or none for a substantial distance, till the train was so near that escape had been cut off * * *.

"In such circumstances, *the question, we think, was for the jury whether reasonable caution forbade his going forward in reliance on the sense of hearing, unaided by that of sight.* No doubt it was his duty to look along the track from his seat, if looking would avail to warn him of the danger. This does not mean, however, that if vision was cut off by obstacles, there was negligence in going on * * *

"* * * If we assume that by reason of the box cars, there was a duty to stop again when the obstructions had been cleared, that duty did not arise unless a stop could be made safely after the point of clearance had been reached * * * the testimony permits the inference that the truck was in the zone of danger by the time the field of vision was enlarged. No stop would then have helped the plaintiff if he remained seated on his truck, or so the triers of the facts might find * * *." (Emphasis added.)

The court then concluded that Pokora did not have the duty as a matter of law, to stop and get out of his vehicle to reconnoitre.

In *Carter* v. *Atlantic Coast Line R. Co.,* 194 S. C. 494, 10 S. E. 2d 17, 21, the decedent, a long time resident of the area, was thoroughly familiar with the crossing upon which he was killed. Some box cars had been left standing on a side track about 215 feet from the crossing obstructing decedent's view toward the approaching train. The tracks were seven feet apart. As decedent approached the crossing at 10-12 miles per hour, he had an open view to his left, from whence the train approached, of the 215 feet and as he approached the crossing his changing angle of vision down the track increased the distance he could see. A witness testified that to see any appreciable distance down the tracks the front wheels of his car would have to be within three or four feet of the tracks. The evidence in the case would justify a finding that the train was traveling anywhere from thirty to sixty miles an hour. Decedent apparently drove onto the tracks before he discovered the approach of the train and was unable to turn back or to avoid being struck. Referring to that situation, the court quoted with approval and applied the following rule:

"It is ordinarily a question for the jury whether under the particular circumstances one who was injured at a railroad crossing at which his view or hearing was obstructed exercised due care * * *."

The case of *Fish* v. *Southern Pac. Co.,* hereinabove referred to, is another one where the court held that the obstruction of the view by box cars near the crossing took the case out of the usual situation where the traveler is held to be contributorily negligent as a matter of law. There the plaintiff drove onto a crossing where box cars had been left on a switch track, the nearest being within two feet of the crossing. The plaintiff was traveling slowly, about twelve to fifteen miles per hour, and the train approached at about the same speed, gliding along, using very little steam and making comparatively little noise. It struck the rear of plaintiff's automobile. The court distinguished this situation from the earlier Oregon cases where plaintiffs had been held contributorily negligent.

The evidence indicated that at a point twenty feet east of the center of the main line track, visibility was limited to thirty-two feet toward the direction of the oncoming train. The court pointed out that the plaintiff's car measured nine feet from the front bumper to the driver's seat which was three feet more than the width of the safety zone between the tracks, and observed that even those figures showing the inadequacy of the "zone of safety" did not tell the entire story as allowance had to be made for the time to react after he perceived the danger and do something to extricate himself therefrom.

The court remarked that there was *no adequate zone of safety between the tracks available to the plaintiff after he could observe the oncoming train.* It appears that there was no whistle blown and the jury could find from the evidence that no bell was rung. The court said:

"Bearing in mind that there is substantial evidence that the track was obstructed by box cars placed there by the appellant, we think that the question of whether or not the plaintiff was guilty of contributory negligence in proceeding forward as he did relying upon his sense of hearing, and concentrating upon that faculty, was for the jury."

In the case of *Newton* v. *Oregon Short Line Railroad Company,* supra, the deceased, a 20-year old boy, was killed by the defendant raidroad's train. There were two tracks on the street. He was standing in the street astride his bicycle between the tracks apparently waiting for the Saltair train to pass him on the north track when the defendant's train came from the opposite direction on the south track, sounded several shrill blasts of the whistle, which failed to attract the boy's attention, but he failed to move and was struck down by the defendant's engine and tender which were proceeding backwards. The court held that the fact that there were these two trains proceeding in opposite directions on the two tracks and that defendant's train was thus proceeding backward presented a confused situation to the deceased; it observed that there was plenty of

evidence that the deceased was guilty of contributory negligence but that the jury could also infer that because of the confusing situation thus presented that the question of whether deceased had used reasonable care under the circumstances was not one so certain and clear that the court should determine it as a matter of law. See also *Cromeenes* v. *San Pedro, L. A. & S. L. R. Co.*, supra, for a case involving a 12-year old boy, and holding that his contributory negligence in going on railroad tracks was a question for the jury. For other cases from this court holding that where unusual conditions of hazard exist at crossings the question of due care of the traveler in going thereon is for the jury, see: *Malizia* v. *Oregon Short Line R. Co.*, 53 Utah 122, 178 P. 756; *Pippy* v. *Oregon Short Line R. Co.*, supra; *Lewis* v. *Rio Grande Western Ry. Co.*, 40 Utah 483, 123 P. 97.

There are cases which hold specifically that such as the case even where there is a train-activated signal in operation. In *Missouri Pacific Railroad Co.* v. *Shell*, 208 Ark. 70, 185 S. W. 2d 81, 83, four occupants of an automobile were killed at a crossing by one of defendant's passenger trains. A train-activated flashing light was operating at the time. There were two engines standing on the tracks near the crossing. The court in affirming verdicts for the plaintiffs stated:

"While the warning lights were flashing when these men drove on the crossing, it appears that there were two locomotives, one standing on each side of the crossing and facing the crossing, and there was testimony that one of these would have set the 'blinker' signal to operating. The jury might have concluded that this led the occupants of the automobile to assume that the signal was being operated as a result of the proximity of one of the locomotives standing near the crossing and that, for that reason, failure to heed this warning was not necessarily negligent.

\* \* \* \* \*

"\* \* \* The switch engine was standing on a spur track, near the main line, about 400 feet down the track in the direction of the approaching passenger \* \* \* The jury may have considered that the presence of the two locomotives, which were standing still, coupled

with the failure of the operators of the passenger train to give the required signals, created a situation which did not establish negligence on the part of the driver of the automobile in proceeding to cross the track slowly."

In *Hough* v. *Atchison, T. & S. F. Ry. C.*, 133 Kan. 757, 3 P. 2d 499, 501, it was claimed that the plaintiff was guilty of contributory negligence mainly because the wig-wag signal was in operation and the gong thereon was ringing when he undertook to drive across the tracks. The court observed

"* * * The ringing of the bell may, as we have seen, constitute a warning of danger. It cannot be regarded as conclusive of the contributory negligence of plaintiff, precluding a recovery."

Another such case is that of *Baltimore and Ohio Railway Company* v. *Deneen*, 4 Cir., 167 F. 2d 799, 801. In that case the court stated:

"Even if it be conceded that the crossing-bell was ringing when Deneen started across the tracks, he might reasonably have thought that the ringing of the bell was still caused by the freight train which had passed to the East of the crossing * * * we therefore think that the District Judge properly left to the jury the question of whether or not Deneen was guilty of contributory negligence."

From the foregoing cases, it appears clearly that where there are special dangers or hazards existing at a crossing it may very well be a jury question as to whether or not the traveler used ordinary reasonable care in going thereon.

Before we proceed to a closer consideration of Toomer's conduct at the crossing, we give attention to defendant's charge that plaintiff cannot recover because Toomer failed to stop. Counsel have stirred up considerable tempest between themselves regarding the duty imposed by Section 57-7-159(a), U. C. A. 1943, which requires the driver of a vehicle approaching a railroad cross-

ing when a train activated signal is working to stop "within 50 feet but not less than 10 feet from the nearest track of such railroad" and not to proceed until he can do so safely. Defendant asserts that the law in Wyoming is presumed to be the same as that of Utah in the absence of proof to the contrary. That is true. The rule has been announced numerous times by this court. See: *Whitmore Oxygen Co.* v. *Utah State Tax Commission,* 114 Utah 1, 196 P. 2d 976; *United Air Lines Transp. Corp.* v. *Industrial Comm.,* 107 Utah 52, 151 P. 2d 591; *Buhler* v. *Maddison,* 105 Utah 39, 140 P. 2d 933.

Plaintiff's counsel offered to testify that he had made a search and that Wyoming had no such statute. The offer was improperly refused. It was made in accordance with Rule 44(f), U. R. C. P. and both the trial court and this court can look to the statute and case law of Wyoming to determine the matter. The Wyoming statutes regarding stopping at crossings makes no reference to train-activated signals. Nevertheless, the trial court instructed the jury that if Toomer failed to stop and this proximately contributed to cause his death, then the plaintiff could not recover. The burden was on the defendant to prove his failure to stop by preponderance of the evidence. See *Evans* v. *Oregon Short Line R. Co.,* 37 Utah 431, 108 P. 638. From the fact that they rendered a verdict for the plaintiff, we assume that they did not so find. The evidence is such that it may not be said that the jury were absolutely required to believe from a preponderance of the evidence that he did not stop.

The question of the statutory duty to stop being thus set aside, we proceed to appraise the circumstances confronting Toomer as he approached the crossing. Within the limits of "reasonable minds" it was the prerogative of the jury to determine the standard of care to be imposed upon him. The visibility was poor

because it was snowing "quite bad." The wig-wag signal was working but the jury could find that ordinary care on Toomer's part would permit him to assume that it was being activated by the freight train standing 30 feet south of the crossing. *Baltimore and Ohio R. Company* v. *Deneen,* supra; *Missouri Pacific R. Co.* v. *Shell,* supra.

Toomer had the duty of making constant use of his faculties of sight and hearing to observe for approaching trains. The presence of this freight substantially interfered with both. They are, of course, concurrent but can be analyzed more clearly by discussing them separately, keeping in mind that they must operate together at all times.

Toomer's ability to see the main line track to the south was obstructed by the freight. Plaintiff presented evidence that it would be necessary for Toomer to cross track No. 2 (the east passing track) and be practically on track No. 3 (the main line) before he could make adequate observation to the south. Allowing for the overhang of both the freight train and the streamliner, there was a clearance of 7½ feet between the tracks. The distance from the front of the plaintiff's truck to the place where the driver would be seated in the cab was 7 feet 11 inches. Plaintiff therefore argues that before Toomer could see the streamliner he would have to have cleared the east side of the freight and thus the front of the truck would have been afoul of the path of the streamliner. This argument does not seem to be exactly accurate because the freight was 30 feet south of the crossing. As Toomer approached from the west, he could have seen south along the main line tracks when he was a short distance west of the freight and the distance he could see south would steadily increase as he proceeded eastward passing the freight. It is not possible to tell from the evidence at just what point he would have been able to see the streamliner. However, the evidence would support a finding by the jury that by the time Toomer got far enough east to be able to see it that there was then no reasonably adequate zone of safety available to him as

suggested in the *Pokora* v. *Wabash Railway Co.* supra, and *Fish* v. *Southern Pacific Co.*, supra cases. In thus going onto the crossing, Toomer had the right to assume that any train approaching the crossing would travel at a speed not greater than 30 miles per hour, the lawful rate, whereas in fact the jury could find that the streamliner's speed was 60 miles per hour, which just cut in two, in time and distance, Toomer's margin of safety after he was able to see the streamliner.

With respect to his ability to hear, the freight also put him at some disadvantage. The noises incident to its presence and operation, together with the fact that it was positioned as it was, would tend to obstruct the noise of the streamliner from passing to Toomer and interfere with his hearing and also might lead him to believe that any sounds coming from the streamliner, even if he heard them, were sounds coming from the freight train.

From the testimony of Mr. Cozzens and Mrs. Sparks, it is apparent that conditions existing at the time and place prevented persons approaching from the west from becoming aware of the presence of the approaching streamliner. They were the only witnesses who approached from that direction, both of whom the jury could believe were exercising ordinary care for their own safety. Each failed to learn of the presence of the streamliner until they proceeded eastward past the freight and were on the main line track and were then both startled to see it. That being so, how could it be so certain that Toomer was bound to have seen or heard the streamliner or its signals, and to have interpreted them as a warning of the approaching streamliner, as distinguished from other possible sounds at the crossing, that no reasonable person would come to the opposite conclusion.

In addition to the situation which confronted Mrs. Sparks and Mr. Cozzens, Toomer undoubtedly saw both of them stop and observe and then proceed across the tracks which is another circumstance the jury could consider in determin-

ing whether or not Toomer exercised the care which an ordinary reasonable and prudent person would have done in proceeding across the crossing. See *Gregg* v. *Western Pac. R. Co.*, 193 Cal. 212, 223 P. 553.

Another fact which the jury could have taken into account was that the freight, being close to the crossing, steamed up ready to move and blowing its whistle as Toomer approached, although he had time to safely pass in front of it, may well have seemed to him the hazzard at the crossing, and thus have drawn his mind and attention from the other oncoming traffic. See the case of *Newton* v. *Oregon Short Line R. Co.*, supra [43 Utah 219, 134 P. 571], where the two trains apparently had confused the deceased. The court said:

"* * * If, therefore, the engine in question had been the only train he was required to see and avoid, the question might be different * * *"

and held that this circumstance was sufficient excuse for deceased's failure to see the train which struck him to make his contributory negligence a jury question. For a similar holding and a more complete discussion of distraction of attention by the presence of a switch engine near the crossing as creating a jury question regarding contributory negligence, see *Doty* v. *Southern Pacific Co.*, 186 Or. 308, 207 P. 2d 131.

Taken all together, the railroad had created a set of circumstances which substantially interfered with both Toomer's sight and hearing of the oncoming streamliner so that more than ordinary difficulties were presented to him in learning of its approach. It appears that reasonable minds could well differ as to whether he might reasonably have been misled into thinking that he could safely cross, and whether under all the circumstances, he used ordinary care for his own safety. The trial court, therefore, properly submitted the question of his contributory negligence to the jury.

The defendants cite and rely on a number of crossing cases where we have held that the traveler was guilty of negligence as a matter of law: *Wilkinson* v. *Oregon Short Line R. Co.*, 35 Utah 110, 99 P. 466; *Shortino* v. *Salt Lake & Utah R. Co.*, 52 Utah 476, 174 P. 860; *Butler* v. *Payne*, 59 Utah 383, 203 P. 869; *Nuttall* v. *Denver & R. G. W. R. Co.*, 98 Utah 383, 99 P. 2d 15; *Nabrotsky* v. *Salt Lake & Utah R. Co.*, 103 Utah 274, 135 P. 2d 115; *Drummond* v. *Union Pacific R. Co.*, 111 Utah 289, 177 P. 2d 903; *Frank* v. *McCarthy*, 112 Utah 422, 188 P. 2d 737; and *Holmgren* v. *Union Pacific R. Co.*, 114 Utah 262, 198 P. 2d 459.

In the cases so relied on, without exception, the ruling was based on the fact that the traveler had a *clear opportunity to observe* the oncoming train. For instance, in the *Drummond* case supra, in distinguishing it from the *Pippy* case, supra, the court took pains to point out that because of the height of the weeds, five to seven feet, alleged to obstruct the plaintiff's view, and the height of the train, about 14 feet, that there was in fact no obstruction of the view and also stated that there was nothing to distract attention from the oncoming train.

The case of *Frank* v. *McCarthy*, supra, does present a situation which merits attention in pointing out the difference between it and the instant case. The plaintiffs, father and son, approached as one of defendant's freight trains was just clearing and moving away from the crossing which temporarily obstructed plaintiffs' view in the direction of another oncoming passenger train. The truck proceeded up to within one foot of the tracks, tried to back up and was struck. It was held that the plaintiffs were guilty of contributory negligence as a matter of law. The court again distinguished the facts from those in the *Pippy* case, remarking that in the *Pippy* case there were a number of tracks (as here) and that in that case the plaintiff's view was obstructed by cars disconnected from any train which would doubtless remain in such stationary position for sometime to block the view of the motorist indefinitely,

whereas in the *Frank* case the freight train was moving further away and it was only a matter of seconds until the obstruction would have been removed and that there was nothing to mislead plaintiffs into thinking that it was safe to go over the tracks. In the *Frank* case, the obstructing train moving away would present no distracting hazard. There was no traffic immediately preceding plaintiffs. There was no evidence concerning and no consideration given to impairment of plaintiffs' ability to hear and distinguish sounds of the oncoming train.

Because, as hereinbefore mentioned, each case must be determined largely on its facts, it would be valueless to continue discussing these cases. In none of them could it be said, as here, that there was definite interference with both the traveler's sight and hearing, coupled with the fact that the circumstances were such that the jury could have found that the traveler may reasonably have been misled into a sense of safety in proceeding across the tracks.

The defendant complains about the vagaries of juries and asks for stern rules against letting them determine these actions. That is really an indictment of the jury system. We could offer what we think is quite a defense for it, notwithstanding its faults, but that defense does not belong in this opinion. Reflection upon the system should reveal the correctness of the rules hereinabove discussed. It is appreciated that enthusiasm for one's cause is a virtue in counsel, but it does not seem so incredible to us as it apparently does to counsel for the defendant that other reasonable minds might honestly take a different view of the evidence in this case.

It is well to keep in mind the principles stated by this court through Mr. Justice Straup in *Pippy* v. *Oregon Short Line R. Co.*, supra, and through Mr. Justice McCarty in *Cromeenes* v. *San Pedro, L. A. & S. L. R. Co.*, supra, to the effect that rights and duties of a traveler and of a railroad company at crossings are mutual and reciprocal. The whole duty is not cast upon either one or

the other to prevent collisions and injuries. The traveler may not carelessly and heedlessly attempt to pass on a crossing on the assumption that the railroad will look out for him. Neither may a railroad company, merely because it is the favored traffic, carelessly and heedlessly operate its trains over crossings at an unusual and excessive speed and without giving adequate warnings, or create a misleading set of circumstances and rely upon the assumption that the traveling public may look out for their safety and keep out of the way of trains.

The question is asked, Where the railroad had a wig-wag signal working, what more could it have done? As has already been stated perhaps too often herein, where reasonable minds could differ as to whether they had used ordinary care, it was for the jury to say whether that standard required additional precautions than were used. In that connection, the jury could have reflected that the three members of the crew in the cab of the freight engine could have realized that the freight train obstructed both the sight and the sound of the streamliner, which they well knew was approaching, and that the situation might be misleading and that one of them could have been sent forward as a flagman to warn travelers using the crossing; or that they could have parked the freight train at least far enough south of the crossing to have permitted such travelers from the west to have sufficient view of the main line tracks to the south to afford a reasonable margin of safety for such traveler to stop after the streamliner was observed. And in addition thereto, that the streamliner could have been operated at a lesser and lawful rate of speed, that is, 30 miles an hour instead of 60 miles an hour which would have doubled the deceased's margin of safety after he was able to see the train.

Defendant claims that the court committed numerous errors in instructions given and requests refused. In all, 32 requested instructions were submitted by the defendant,

reworking in numerous ways and emphasis of the duty of the deceased and lack of it on the defendant railroad. The purpose and desire of the trial court is to formulate a short, simple and clear charge to the jury. Such a profusion of requests of the character submitted by defendant would be anything but helpful to the court in that regard and would in fact present considerable hazard to him in selecting such instructions, or parts of instructions, as should actually be given. After this is done, it is easy enough to go through the instructions "with a fine toothed comb" and by placing one's own construction thereon make plausible arguments of error. Many of the claimed errors are based upon the assumption that the defendant is correct in its contention that there is no evidence of the defendant's negligence and that all of the evidence shows conclusively that Toomer was guilty of contributory negligence. As hereinabove indicated, we do not accept that point of view. Concerning the matter of the instructions regarding speed, we observe that under the conditions which existed, the defendant's duty with respect to speed of the streamliner was that which was safe, reasonable and prudent under the circumstances.

If all of the instructions are considered together, as they must be, we believe that the trial court adequately and properly defined the duties of the respective parties and fairly submitted the issues to be tried to the jury, and we are not convinced that prejudicial error was committed therein. What has heretofore been said treats the meritorious points of the defendant's appeal and we deem it valueless to dwell further on the matter by discussing the instructions in detail.

Judgment is affirmed. Costs to Respondent.

WOLFE, C. J., and WADE and McDONOUGH, JJ., concur.

HENRIOD, J., concurs in the result.